## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| DWAYNE G. CARMOUCHE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 06-2074 |
| | § | |
| | § | |
| MEMC PASADENA, INC. | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

Plaintiff, Dwayne G. Carmouche, sued his former employer, MEMC Pasadena, Inc.,
alleging disability discrimination, interference with disability benefits, and retaliation for
applying for disability and worker's compensation benefits.  Carmouche asserted violations
of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112(a); the Texas worker's
compensation act, Texas Labor Code § 21.05; and the Employee Retirement Income Security
Act (ERISA), 29 U.S.C. § 1140.  (Docket Entry No. 1).[1]  MEMC has moved for summary
judgement on all claims, (Docket Entry No. 12), Carmouche has responded, (Docket Entry
No. 15), and MEMC has replied, (Docket Entry No. 18).

---

[1]Carmouche also asserted claims for violations of the Family and Medical Leave Act (FMLA), 29
U.S.C. § 2615, and for retaliation under the ADA.  (Docket Entry No. 1).  He withdrew these claims in his
response to MEMC's summary judgment motion.  (Docket Entry No. 15).

Based on the pleadings; the motion, response, and reply; the parties' submissions; and the applicable law, this court grants MEMC's summary judgment motion and enters final judgment by separate order.  The reasons are explained in detail below.

I.      **Background**

In 1997, MEMC hired Carmouche as an operator at its manufacturing plant in Pasadena, Texas.  (Docket Entry No. 1 at 4).  By 2001, Carmouche was a back-end operator. (Docket Entry No. 12, Ex. A at 6).  This position included rotating shifts with warehouse, manufacturing, and inside process-board operator duties.  (*Id.*, Ex. A at 6–7).  Carmouche's warehouse duties consisted of packaging chemical product.  (*Id.*, Ex. A at 8).  In the manufacturing unit, his duties included taking product samples, turning valves, and taking reactors off-line in preparation for cleaning or maintenance.  (*Id.*, Ex. A at 9).  The inside process-board operator duties required Carmouche to monitor and record unit functions in a manufacturing control room.  (*Id.*).

On March 27, 2001, Carmouche was injured at the plant.  (*Id.*, Ex. A at 10).  He was diagnosed with facet syndrome, a lower back impairment.  (*Id.*, Ex. A at 16).  Carmouche did not work for four months, during which he received worker's compensation benefits. (Docket Entry No. 1 at 4, Docket Entry No. 12, Ex. A at 10).  He returned to work on light duty under the care of his physician, Dr. Vu Doan Theriot.  (*Id.*, Ex. A  at 10–11).

In 2004, Carmouche bid on and obtained the position of inside process-board operator.  (*Id.*, Ex. A  at 12; Docket Entry No. 15, Ex. A at 2).  In this position, Carmouche

performed only inside process-board operator functions.  He could stand, stretch, and move around as necessary.  (Docket Entry No. 12, Ex. A at 19–20, Ex. B at 4; Docket Entry No. 15, Ex. A at 2).  Carmouche was able to perform this job.  (Docket Entry No. 12, Ex. A at 19–20, Ex. B at 4; Docket Entry No. 15, Ex. A at 2).

On March 31, 2005, Dr. Theriot released Carmouche to work on a full-duty, no-restriction basis.  (Docket Entry No. 12, Ex. B at 32).  On April 5, 2005, Carmouche asked MEMC Human Resource Manager Stephen Higgins for paid time off to attend a child support hearing.  (Docket Entry No. 12, Ex. A at 46–47).  Higgins denied Carmouche's request for paid leave.  (*Id.*, Ex. A at 48–49).  Carmouche did not report any physical problems to Higgins at that time.  (*Id.*, Ex. A at 51).

The following day, April 6, 2005, Carmouche went to see Dr. Theriot.  (*Id.*, Ex. A at 50).  Carmouche testified that he was having back spasms when he visited the doctor.  (*Id.*).  Carmouche did not remember whether his back was in spasms when he spoke to Higgins on the previous day, (*id.*, Ex. A at 51), but testified  that his "back was always hurting," (*id.*, Ex. A at 52).  Dr. Theriot restricted Carmouche from all work due to chronic back pain. (Docket Entry No. 12, Ex. B at 33).  Carmouche did not return to work at all for ten months.

While on medical leave from work, Carmouche filed a short-term disability claim with UNUM Provident, the third-party administrator of MEMC's short-term disability plan. (Docket Entry No. 12, Ex. B at 17; *Id.*, Ex. C at 3–4).  MEMC had a self-funded short-term disability plan through which it paid all short-term disability benefits in 2005.  (*Id.*).  Under

3

MEMC's plan, an employee was eligible for short-term disability benefits if UNUM determined that the employee is "limited from performing the material duties of [his] regular occupation due to [his] sickness or injury" and has a "20% or more loss in weekly earnings due to the same sickness or injury." (*Id., * Ex. B at 22).  If UNUM approved an employee's short-term disability claim, the employee received short-term benefits amounting to 75% of predisability earnings.  (Docket Entry No. 15, Ex. F at 10).  Benefits were paid through MEMC's payroll. (*Id.*).  The maximum in short-term disability benefits was 1,040 hours in a rolling 52-week period. (*Id.*).  An employee could receive long-term benefits only after he has exhausted his short-term disability benefits and qualifies. (*Id.*, Ex. F at 11; Docket Entry No. 12, Ex. A at 35).

On June 8, 2005, UNUM approved short-term disability benefits for Carmouche through July 26, 2005.  (Docket Entry No. 12, Ex. B at 17–18).  UNUM informed Carmouche that a claim for short-term disability benefits beyond July 26, 2005 would require his physician to submit medical information supporting an inability to work due to continued disability. (*Id.*).  On July 27, 2005, Carmouche requested additional short-term disability benefits and submitted a doctor's note stating that he was unable to return to his job. (*Id.*, Ex. B at 20).

On August 11, 2005, Higgins emailed and called UNUM Account Manager Cassandra Johnson about Carmouche's claim. (Docket Entry No. 15, Ex. B at 4).  Higgins stated that his "confidence level in the validity" of the claim was "very low." (*Id.*).  He inquired "about

the option of a third party evaluation to determine whether these restrictions and this prognosis are valid." (*Id.*). UNUM did not consider Higgins's concerns in deciding whether to approve Carmouche's claim for short-term benefits through July 2005 because it had already "made the appropriate decision thus far" based on its medical review of the claim. (Docket Entry No. 12, Ex. B at 16).

Higgins testified that he "had a number of conversations with [UNUM] along the way" regarding Carmouche's efforts to extend his short-term disability benefits. (Docket Entry No. 15, Ex. F at 3). The record shows that UNUM sought medical information from Carmouche and his medical providers before deciding whether to extend the short-term disability benefits after July 2005. (Docket Entry No. 12, Ex. B at 17–18, 20). On August 25, 2005, UNUM notified Carmouche that the note he submitted from Dr. Theriot was "not sufficient to consider benefits beyond July 26, 2005." (Docket Entry No. 12, Ex. B at 20). UNUM asked Carmouche to submit his "discharge summary as well as any other medical information from [his] pain management program" and additional medical records. (*Id.*). UNUM told Carmouche that "a note from [his] physician saying [he] cannot return to work will not be sufficient without the supporting medical data listed above." (*Id.*).

Carmouche submitted records from his therapist and pain specialist. (*Id.*, Ex. B at 22). On September 6, 2005, UNUM informed Carmouche that it would not extend his short-term disability benefits beyond July 26, 2005. (*Id.*). UNUM explained that the updated records provided by Carmouche's therapist and pain specialist indicated "significant

5

improvements in [Carmouche's] ability to manage back pain," as well as "improved tolerance for performing non-material and material handling tasks." (*Id.*, Ex. B at 22–23). Based on these records, UNUM concluded that Carmouche was not "restricted or limited from performing the material and substantial duties of [his] regular occupation." (*Id.*, Ex. B at 23).

UNUM invited Carmouche to file an appeal if he disagreed with the claim decision and to provide new supporting documentation. (*Id.*). Carmouche did so. During the appeal, UNUM asked Higgins for a description of the physical demands of Carmouche's job. On October 24, 2005, Higgins provided the description. (Docket Entry No. 15, Ex. B at 7). Higgins used a highlighter to identify activities performed inside the control room and told MEMC that "[t]he highlighted sections are the pieces that pertain to [Carmouche's] duties." (*Id.*, Ex. B at 8–10).

On October 27, 2005, UNUM upheld its decision to deny Carmouche's claim for extended short-term disability benefits. (Docket Entry No. 12, Ex. B at 25–27). UNUM's medical review of Carmouche's clinic records did not show that he was unable to do the work of an inside process-board operator. (*Id.*, Ex. B at 25). Based on the "job as described by the employer," UNUM concluded that Carmouche could perform those job duties with the restrictions and limitations shown in his clinic file. (*Id.*, Ex. B at 25–26). UNUM asked Carmouche to submit his October 2004 MRI report to facilitate a determination of his medical status. (*Id.*).

In response to UNUM's request, Carmouche submitted a Release to Work Status form and a Texas Worker's Compensation Status Report, both dated November 14, 2005. (*Id.*, Ex. B at 29). The Worker's Compensation Status Report stated that Carmouche had "chronic low back pain." (*Id.*, Ex. B at 45). The Release to Work Status form was signed by Dr. Theriot and stated that Carmouche had "chronic low back pain, with worsening symptoms that prevent him from returning to work at MEMC." (*Id.*, Ex. B at 29, 44; Docket Entry No. 15, Ex. C at 4). Neither form described symptoms, listed restrictions, or provided physical examination data. (Docket Entry No. 12, Ex. B at 29). UNUM's medical reviewer concluded that "the additional information submitted does not contain any clinical information that would change the previous opinion." (*Id.*). On January 9, 2006, after Carmouche's second appeal, UNUM upheld its decision. (*Id.*, Ex. B at 28–29).

The following day, January 10, 2006, Dr. Theriot lifted Carmouche's "no work" restriction and released him to return to work on light duty. (*Id.*, Ex. B at 30). Dr. Theriot imposed the following restrictions: no bending, stooping, pushing, pulling, or climbing ladders; no lifting or "carrying objects of 10 pounds for more than 8 hours per day"; "Light duty – Control Room OK"; and "May get up and move around as needed." (*Id.*). Carmouche testified in his deposition that these restrictions would prevent him from performing jobs requiring physical labor, (Docket Entry No. 12, Ex. A at 18), but would not prevent him from resuming the inside process-board operator position he had held before his ten-month absence. (*Id.*, Ex. A at 19–20; *id.*, Ex. B at 4; Docket Entry No. 15, Ex. A at 4–5).

Carmouche testified that his pain varied from day to day.  He had lifted over twenty-five pounds during pain-management sessions (in violation of Dr. Theriot's limits) and could sit for up to five hours on some days but not as long on other days.  (Docket Entry No. 12, Ex. A at 20–22).

MEMC told Carmouche that because of his extended absence, he had to take a "Fit to Work test" before he could return to work.  (*Id.*, Ex. B at 30).  The test was to "ensure [Carmouche's] ability to perform operator work." (*Id.*).  If he passed the test, MEMC would permit him to begin "the process of re-training and re-qualifying on the 9500 Outside Operator job." (*Id.*).  This process would allow Carmouche "to ultimately re-qualify to return to [his] former position" as an inside process board operator.  (*Id.*).  Higgins stated in his affidavit that the process of retraining and requalification in the outside operator job "was a prerequisite to Mr. Carmouche's return to work" in the inside operator job.  (*Id.*, Ex. C at 11).  The outside operator job involves significantly more physical demands than the inside operator job.  (Docket Entry No. 15, Ex. A at 5).

Eric Graff, Manufacturing and Engineering Services Manager for MEMC, stated in his affidavit that the retraining and requalification process measures an employee's ability safely to perform the essential functions of the process board operator job.  (Docket Entry No. 12, Ex. C at 14–15).  The essential functions of this position are "to verbally instruct outside operators (in a step-by-step fashion) of the procedures the outside operators must follow" and to "[t]roubleshoot and direct outside operators during upset process conditions

to regain stable operating conditions." *(Id.*, Ex. C at 15).  Because inside process-board operators perform these functions remotely from the control room in real time, they must "know (and be able to explain) where all of the outside equipment in the unit is located, how the equipment works, and the procedures to be followed." *(Id.*).  In his affidavit, Graff stated that MEMC "has maintained a consistent practice of requiring any employee wishing to obtain work on the process board to first demonstrate proficiency and understanding of all outside process operator jobs." (*Id.*).  MEMC requires "that any process board operator that may be away from work long enough for his or her qualifications to lapse on the process board, must again retrain and requalify on the outside jobs." *(Id.*).  Graff stated that he instituted this requirement after becoming Manufacturing and Engineering Services Manager in 2002. (*Id.*, Ex. C at 16–17).  MEMC asserts that Carmouche's qualifications as a process-board operator lapsed because of his ten-month absence from work.  (*Id.*, Ex. C at 15–16; Docket Entry No. 18 at 14).  For this reason, "MEMC required that Mr. Carmouche complete the   retraining and requalification process before returning to the process board job." (Docket Entry No. 12, Ex. C at 16).

Carmouche asserts that MEMC "did not have this requirement for other operators, who were allowed to return to their board jobs without having to re-qualify on the outside operator jobs."  (Docket Entry No. 15 at 2).  Carmouche does not dispute that before an employee can work as an inside process-board operator, MEMC requires that employee to qualify as an outside process-board operator.  In his summary judgment response, Carmouche

identifies other operators who were inside process-board operators, absent for medical reasons, then allowed to return without having to requalify for the outside process-board operator job.  (Docket Entry No. 15 at 10–11).  Carmouche asserts that he was "singled out" when he was prevented from returning to his inside job without having to qualify for the outside job as well.  (*Id.* at 11).  MEMC responds that none of the other operators were gone for periods approaching Carmouche's ten-month absence.

On January 20, 2006, Higgins forwarded Dr. Theriot's light-duty release to Bayport Occupational Medical Center "for their review and opinion regarding [Carmouche's] ability to undergo the Inside and Outside Operator Fit to Work Test."  (Docket Entry No. 12, Ex. B at 30).  Bayport Clinic advised MEMC that Carmouche's restrictions prevented him from undergoing the "Inside and Outside Operator Fit to Work" test.  (*Id.*, Ex. B at 31).  MEMC concluded that Carmouche's inability to undergo the test, which "reflect[s] the actual physical demands of the MEMC 9500 Outside Operator job," meant that he was "unable to perform the essential functions of [his] job."  (*Id.*).  MEMC informed Carmouche that there was "no known reasonable accommodation that would allow [him] to re-train and re-qualify" for the position.  (*Id.*).  On January 27, 2006, MEMC removed Carmouche from its active payroll.  *(Id.)*.

On February 14, 2006, Carmouche filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging disability discrimination.  (*Id.*, Ex. B at 48).  The EEOC issued a right-to-sue notice on April 28, 2006.  (*Id.,* Ex. B  at 51).  On

July 19, 2006, Carmouche filed this suit.  (Docket Entry No. 1).  He alleges disability discrimination in violation of the ADA, 42 U.S.C. §§ 12112(a) and b(5), and the Texas Labor Code § 21.051.  (*Id.*).  He also alleges that MEMC discharged him in retaliation for requesting accommodations for his disability, in violation of the Texas Labor Code § 21.055. (*Id.*).  Carmouche also alleges interference with his disability benefits, in violation of section 510 of ERISA, 29 U.S.C. § 1140.  (*Id.*).  Finally, Carmouche alleges that MEMC discharged him in retaliation for applying for disability benefits – an ERISA violation – and for applying for worker's compensation benefits – a Texas Labor Code § 451.001 violation.  (*Id.*).  Carmouche asks this court to defer ruling on the worker's compensation claim and allow him to pursue it in state court, asserting "a possible lack of subject matter jurisdiction" in federal district court.  (*Id.*).

After discovery, MEMC filed this motion.  The summary judgment evidence includes the depositions of Dwayne Carmouche, (Docket Entry No. 12, Exs. A–B), Stephen Higgins, (*id.*, Ex. C), Bob Zapf, an MEMC operator, (Docket Entry No. 15, Ex. D), Troy Powell, an MEMC operator, (*id.*, Ex. E), and Debra McDonald, President of USW Local 6000, which represents MEMC workers, (*id.*, Ex. F); the affidavits of Carmouche, (*id.*, Ex. A), Higgins, (Docket Entry No. 15, Ex. C), and Eric Graff (*id.*); letters from UNUM and Higgins to Carmouche, (Docket Entry No. 12, Ex. B); Carmouche's worker's compensation reports, (*id.*); Carmouche's claim folder, (Docket Entry No. 15, Exs. A–B); communications between

Higgins and UNUM (*id.*, Ex. B); job descriptions for the inside and outside operator positions (*id.*, Ex. C); and documents relating to MEMC's disability plans, (*id.*, Ex. F).

## II.   The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56.  Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir.2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir.2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir.2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id.* The nonmovant must "do more than simply show that there is some metaphysical doubt as

to the material facts." *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir.1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255.

## III.   The ADA Claims

Carmouche asserts that he was disabled under the ADA because he had an actual disability, a perceived disability, and a record of disability. (Docket Entry No. 15 at 6–8). Carmouche asserts that MEMC refused to provide him with reasonable accommodation for his disability by allowing him to resume his inside process-board operator position without first requalifying as an outside operator or by doing so through a written test that could demonstrate his knowledge of the outside operator job. (*Id.* at 9–10). MEMC argues that there was no disability discrimination and that Carmouche was not entitled to accommodation because he was not disabled. (Docket Entry Nos. 12 at 24, 18 at 13).

### A.   Summary Judgment under the ADA

Section 12112(a) of the ADA states:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a).

The elements of a *prima facie* showing of disability discrimination under the ADA are that the plaintiff is a "qualified individual" with a "disability" as defined by the ADA and that an adverse employment decision was made because of the disability. *See Holtzclaw v. DSC Communications Corp.*, 255 F.3d 254, 258 (5th Cir. 2001); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 (5th Cir. 1999). If the plaintiff makes a *prima facie* showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 881 (5th Cir. 2003); *Sherrod v. American Airlines, Inc*., 132 F.3d 1112, 1122 (5th Cir. 1998). If the defendant satisfies this burden, the plaintiff has the burden of showing that the proffered reasons are pretextual. *Gowesky*, 321 F.3d at 511. If the claim reaches the pretext stage, the issue is whether the totality of the evidence, including the evidence raised at the *prima facie* case and pretext stages, raises a genuine issue of disputed fact material to determining whether the defendant failed to provide reasonable accommodation or fired the plaintiff because of his disability. *See Calbillo*, 288 F.3d at 725; *Anderson*, 477 U.S. at 255. The question on summary

judgment is whether there is a conflict in substantial evidence to create a jury question of disability discrimination. *See Gowesky*, 321 F.3d at 512.

**B.     Disability**

"As a threshold requirement in an ADA claim, the plaintiff must . . . establish that he has a disability." *Rogers v. Int'l Marine Terminals*, 87 F.3d 755, 758 (5th Cir. 1996).  The ADA defines "disability" as: (1) "a physical or mental impairment that substantially limits one or more major life activities"; (2) "a record of such an impairment"; or (3) "being regarded as having such an impairment."  42 U.S.C. § 12102(2).  "A plaintiff cannot assert that his employer is required to make reasonable accommodations to his physical or mental limitation until he satisfies the test for disability discrimination." *Lindsey v. Chevron USA Inc.*, No. 02-60056, 2002 WL 31415255, at *4 (5th Cir. Oct. 10, 2002).

*1.     Actual Disability*

Carmouche claims that he was disabled because he was substantially limited in one or more major life activities and in the major life activity of working. (Docket Entry No. 15 at 6). Carmouche argues that his doctor restricted him from all work activity in April 2005 and later restricted him from work requiring bending, twisting, squatting, climbing ladders, lifting more than ten pounds, and from sitting for extended periods without the ability to get up and move around as needed. (*Id.*). MEMC asserts that Carmouche was not disabled in a major life activity, including working. (Docket Entry No. 18 at 9).

15

MEMC does not dispute that Carmouche has facet syndrome with a history of back pain. "Merely having an impairment does not make one disabled for purposes of the ADA." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). To be disabled requires more: "an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *Id.* at 198. The impairment must have an impact that is "permanent or long term." *Id.*; *see also Hinojosa v. Jostens Inc.*, 128 Fed. Appx. 364, 368 (5th Cir. 2005). "The term 'disability' does not include temporary medical conditions, even if those conditions require extended leaves of absence from work." *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 199 (4th Cir. 1997) (citation omitted). A plaintiff "must prove that he was disabled at the time of the alleged discriminatory act." *Lottinger v. Shell Oil Co.*, 143 F. Supp. 2d 743, 761 (S.D. Tex. 2001).

"Major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (quoting 29 C.F.R. § 1630.2(I)). "Other major life activities could include lifting, reaching, sitting, or standing." *Id.* at 726 n.7. A plaintiff "must also show that the limitation on the major life activity is substantial." *Hinojosa*, 128 Fed. Appx. at 366. "Disability" requires a plaintiff to be "*prevented* or even *severely restricted* from performing" the activities of "daily living." *Id.* at 367. "The central inquiry must be whether the claimant is unable to perform the variety of tasks central to most

16

people's daily lives," rather than on "the impairment's effect in the workplace." *Toyota*, 534 U.S. at 185.

If an individual is not severely restricted from engaging in activities central to daily life, courts have found that limits on lifting, bending, pulling, and pushing do not prevent or severely restrict that individual from major life activities.  *See Coats v. Goodyear Tire & Rubber Co.*, No. 02-21286, 2003 WL 21145732, at *1 (5th Cir. Apr. 30, 2003) (holding that restrictions on lifting, pushing, and pulling did not restrict plaintiff from engaging in activities of central importance to daily life); *Dupre v. Charter Behavioral Health Sys. of Lafayette, Inc.*, 242 F.3d 610, 614 (5th Cir. 2001) (holding that plaintiff, who could sit or stand for up to one hour at a time, was "not significantly restricted as compared with the average person"); *Ray v. Glidden*, 85 F.3d 227, 229 (5th Cir. 1996) (holding that a ten-pound lifting restriction does not amount to a substantial limitation of a major life activity); *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 & n.2 (5th Cir. 1996) (quoting *Rogers*, 87 F.3d at 758 n.2)(restriction on climbing stairs did not substantially limit a major life activity).

Carmouche has not raised a fact issue as to whether his physical restrictions prevented him from engaging in activities of central importance to daily life.  The restrictions on Carmouche's ability to bend, stoop, push, pull, climb ladders, lift more than ten pounds, and sit for extended periods without moving or standing periodically do not amount to substantial limitations of major life activities.  *See Hinojosa*, 128 Fed. Appx. at 366; *Coats,* 2003 WL

17

21145732, at *1; *Ray*, 85 F.3d at 229; *Robinson*, 101 F.3d at 37 & n.2.  Carmouche is able to sit for extended periods without moving around.  (Docket Entry No. 12, Ex. A at 20–21).  The record shows that Carmouche is not so substantially limited in his ability to move, sit, or stand as to be substantially limited in a major life activity.  *See Dupre*, 242 F.3d at 614.

Even if a plaintiff is not substantially limited with respect to a specific activity, such as sitting or standing, he may be limited in the major life activity of working.  *Dutcher*, 53 F.3d at 726 & n.10.  An individual is substantially limited in the major life activity of working if he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  *Id.* at 727 (quoting 29 C.F.R. § 1630.2(j)(3)(I)).  If a plaintiff's physical restrictions do not exclude him from "a substantial class of jobs," he cannot establish disability under the ADA.  *Dupre*, 242 F.3d at 615 & n.5 (holding that plaintiff, who was able to engage in light labor but not intense physical exertion, was not substantially limited in the major life activity of working); *see also Bridges v. City of Bossier*, 92 F.3d 329, 334–36 (5th Cir. 1996) (holding that plaintiff's disqualification from his chosen  line of work of firefighting did not exclude him from a "class of jobs" under 29 C.F.R. § 1630.2(j)(3)(I)).

In this case, Carmouche took a four-month leave after his 2001 injury, then worked on a light-duty basis until March 31, 2005, when he was released to work on a full-duty, no-

18

restriction basis.  (Docket Entry No. 12, Ex. A at 10; *Id.*, Ex. B at 32).  On April 6, 2005, Dr.

Theriot restricted Carmouche from all work.  (Docket Entry No. 12, Ex. B at 33).  On

January 10, 2006, Dr. Theriot released Carmouche to return to work on a light-duty basis,

which allowed him to perform the duties of an inside process-board operator.  (*Id.*, Ex. B at

33, 47).  Carmouche does not dispute that before March 2005 and in January 2006, he was

capable of working as an inside process-board operator.  The fact that Dr. Theriot did not

medically release Carmouche to return to work from April 2005 to January 2006 does not

make him "disabled" under the ADA.  *See Halperin*, 128 F.3d at 199.  Carmouche was

released to work before his discharge on January 27, 2006.  *See Lottinger*, 143 F. Supp. 2d

at 761.

Carmouche's restrictions on the amount of weight he could lift and the prohibitions

on bending, stooping, pushing, pulling, and climbing ladders, made him unable to work as

an outside process-board operator or in similarly physically demanding jobs, but left him

physically able to work a wide class of jobs and a range of jobs in various classes, including

as an inside process-board operator.  (Docket Entry 12, Ex. A at 19–20, Ex. B at 4; Docket

Entry No. 15, Ex. A at 4–5).  The evidence shows that these physical limits and restrictions

did not prevent Carmouche from performing jobs besides that of an inside process-board

operator.  (Docket Entry No. 12, Ex. B at 7).  Carmouche's physical limits and restrictions

did not exclude him from a class of jobs or a range of jobs in various classes.  He was not

substantially limited in the major life activity of working under the ADA. *See Dupre*, 242 F.3d at 615 & n.5; *Bridges*, 92 F.3d at 334–36; *Dutcher*, 53 F.3d at 727.

### 2. Perceived Disability

Carmouche also asserts that MEMC regarded him as disabled. (Docket Entry No. 15 at 7). He points to his termination letter, which stated that his physical restrictions prevented him from taking the Fit to Work test. (*Id.*). Carmouche argues that he was physically capable of performing the inside process-board operator duties. (*Id.*). He argues that because MEMC considered him physically unable to undergo the test for, or duties of, the outside process-board operator job, and therefore unable to qualify for his former inside process-board operator position, MEMC "perceived him to be significantly restricted in his ability to perform either a class of jobs or a broad range of jobs in various classes." (*Id.*).

Under the ADA, a plaintiff is "regarded as" disabled if he: "(1) has an impairment which is not substantially limiting but which the employer perceives as . . . substantially limiting . . . ; (2) has an impairment which is substantially limiting only because of the attitudes of others towards such an impairment; or (3) has no impairment at all but is regarded by the employer as having a substantially limiting impairment." *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 475 (5th Cir. 2006). "An employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on his ability to work in general." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 807 n.10 (5th Cir.

20

1997) (quoting *Chandler v. City of Dallas*, 2 F.3d 1385, 1393 (5th Cir. 1993)).  If a plaintiff asserts that his employer regarded him as substantially limited in the major life activity of working, he must demonstrate that the employer "believed he was unable to work in a broad class of jobs." *Rodriguez*, 436 F.3d at 475 (quoting *Sutton v. United Air Lines. Inc.*, 527 U.S. 471, 491 (1999)) (holding that plaintiff was regarded as disabled because his employer believed that he was not qualified for any other job at its plant).  It is insufficient to show that an employer believes the plaintiff cannot perform a particular job.  *Collins v. Saia Motor Freight Lines, Inc.*, No.  04-30958, 2005 WL 1140777, at *2 (5th Cir. May 16, 2005) (holding that evidence that plaintiff's perceived disability affected three specific types of positions was "insufficient to establish a broad range of employment")*; Mason v. United Air Lines, Inc., Inc.*, 274 F.3d 314, 317 (5th Cir.  2001) (holding that employer, who determined that plaintiff's limitations prevented him from performing only his job and not other jobs with different requirements, did not regard plaintiff as disabled).

The undisputed evidence in this case does not raise a fact issue as to whether MEMC believed that Carmouche was physically unable to work in a broad class of jobs.  Bayport Medical Services told MEMC that Carmouche was unable to undergo the Fit to Work Test for the duties of an outside board operator.  (Docket Entry 12, Ex. B at 31).  The information that Carmouche was unable to undergo this test or work as an outside process-board operator, which Carmouche does not dispute, does not raise a fact issue as to whether MEMC perceived him as unable to work in a broad class of jobs or a range of jobs in different

classes.  *See Foreman*, 117 F.3d at 807 n.10.  MEMC concluded that, because Carmouche could not take a test it viewed as necessary to requalify for both the outside and inside operator jobs, he was "unable to perform the essential functions of [his] job." (Docket Entry 12, Ex. B at 31).  There is no evidence that MEMC believed Carmouche was physically unable to perform a broad class of jobs or a range of jobs in different classes.  Carmouche has failed to raise a fact issue as to whether MEMC regarded him as disabled.  *See Rodriguez*, 436 F.3d at 475; *Collins*, 2005 WL 1140777, at *2; *Mason*, 274 F.3d at 317.

> 3.    *Record of Disability*

Carmouche asserts that his worker's compensation status reports, restrictions from physical labor, and receipt of short-term disability benefits all show a record of disability. (Docket Entry No. 15 at 8).  To demonstrate a record of disability, a plaintiff must show that: (1) he has a record or history of impairment; and (2) the impairment substantially limits a major life activity.  *Blanks v. Sw. Bell Commc'ns, Inc.*, 310 F.3d 398, 402 (5th Cir. 2002); *Dupre*, 242 F.3d at 615.  "Although an individual may show that he or she has a record of impairment, if he or she fails to show that the impairment is substantially limiting, the individual may not qualify as disabled under this prong."  *Blanks*, 310 F.3d at 402.

Carmouche was off work for four months in 2001; on light duty from 2001 to 2005; on full duty from March 31, 2005 to April 5, 2005; off work from April 6, 2005 to January 10, 2006; then released to light duty.  Although Carmouche had physical restrictions when he was released to work on light duty from 2001 to March 2005 and in January 2006, he was

not substantially limited in major life activities, including the major life activity of working. He was able to work in different jobs, including as an outside process-board operator, during those periods. *See Blanks*, 310 F.3d at 402; *Dupre*, 242 F.3d at 615.  Carmouche's temporary absence from work for four months in 2001, followed by four years of working, and his ten months in 2005, followed by a release to the same job he had previously held, do not constitute a record of disability under the ADA.  *See Moody*, 1999 WL 153032, at *3; *Gutridge*, 153 F.3d at 901–02.

Carmouche received short-term disability benefits for an inability to perform the job duties of an inside process-board operator (as opposed to an inability to perform a class of jobs or a range of jobs in different classes) from April 9, 2005, to July 26, 2005.  (Docket Entry No. 12, Ex. B at 17–21).  The short-term disability benefits that Carmouche received during his temporary leave do not raise a fact issue as to a record of a disability under the ADA.  *See Stephens*, 279 F. Supp. at 283–84.

The undisputed evidence in the record shows that as a matter of law, Carmouche is not disabled under the ADA.  As a result, MEMC did not owe him a duty of reasonable accommodation.  MEMC is entitled to summary judgment on this claim.

## IV.    The ERISA Claims

Carmouche alleges that Stephen Higgins retaliated against him for exercising "his rights to receive extended disability benefits" and interfered with his ability to obtain benefits by communicating to UNUM Higgins's doubts about the legitimacy of Carmouche's claim.

(Docket Entry No. 15 at 14–16).  MEMC argues that Carmouche has failed to state a claim

for retaliation or interference under section 510 of ERISA and has not raised a fact issue as

to whether MEMC interfered with the attainment of a right to which Carmouche would have

otherwise been entitled.[2]  (Docket Entry No. 18 at 16–20).

Under section 510 of ERISA, it is unlawful "for any person to discharge, fine,

suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising

---

[2]Carmouche maintains that MEMC's short-term and long-term disability plans are covered by ERISA.  The record shows that MEMC's short-term plan is likely not an ERISA plan.  ERISA does not cover payroll practices involving "payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties, or is otherwise absent for medical reasons."  29 C.F.R. § 2510.3-1(b)(2).  MEMC has provided evidence that it has a self-funded short-term disability plan administered by UNUM.  (Docket Entry No. 12, Ex. B at 17, Ex. C at 3–4).

Carmouche asserts that MEMC's short-term plan is not exempt from ERISA because it provides less than "normal compensation."  (Docket Entry No. 15 at 13–14).  "Since 1979, the Department of Labor has penned eleven opinion letters defining 'normal compensation' to include payments of less than full salary." *Bassiri v. Xerox Corp.*, 463 F.3d 927, 930 (9th Cir. 2006).  Every court that has considered whether "normal compensation" includes employer plans providing less than full salary has deferred to this definition, finding such plans exempt from ERISA.  *Id.* at 930–34 (holding that income plan providing 60% of employee's salary fell within the scope of ERISA exemption).  The level of compensation provided by MEMC, amounting to 75% of pre-disability earnings, (Docket Entry No. 15, Ex. F at 10), does not remove its short-term plan from exemption under 29 C.F.R. § 2510.3-1(b)(2).

Carmouche argues estoppel, citing MEMC and UNUM documents that reference ERISA rights.  (Docket Entry No. 15 at 13).  An employee claiming equitable estoppel must show: "(1) a material misrepresentation; (2) reasonable and detrimental reliance upon the representation; and (3) extraordinary circumstances."  *Mello v. Sara Lee Corp.*, 431 F.3d 440, 444–45 (5th Cir. 2005) (holding that plaintiff's reliance on informal benefits statements and oral representations was unreasonable given the unambiguous terms of his ERISA plan).  Materiality refers to "pertinent information" about an employer's plan.  *Id.* at 445.  There must be "a substantial likelihood that a reasonable employee would be misled about making adequately informed decisions." *Id.* Reliance "must be both reasonable and detrimental." *Id.*

An employer's labeling or characterization of a plan "is not determinative of whether a plan is governed by ERISA." *Langley v. Daimler Chrysler Corp.*, 502 F.3d 475, 481 (6th Cir. 2007).  Where "an employer pays an employee's normal compensation for periods of mental or physical disability entirely from its general assets, the program constitutes an exempted payroll practice" regardless of whether the employer has characterized its plan as an ERISA plan. *Id.* (quoting *Stern v. Int'l Bus. Mach. Corp.*, 326 F.3d 1367, 1374 (11th Cir. 2003)).

MEMC's references to ERISA rights in the table of contents for plan documents, (Docket Entry No. 15, Ex. F at 13), does not remove its short-term disability plan from exemption under 29 C.F.R. § 2510.3-1(b)(2), *see Langley*, 502 F.3d at 481.  UNUM's January 9, 2006 letter, which references the "right to bring a civil suit under section 502(a)," (Docket Entry No. 12. Ex. B at 28–29), does not modify the terms of MEMC's plan.  Carmouche's reliance on these documents was not reasonable or detrimental. *See Mello*, 431 F.3d at 445–47.  However, even if the short-term disability plan is covered by ERISA, Carmouche's retaliation and interference claims fail.

any right to which he is entitled" or "for the purpose of interfering with the attainment of any

right to which such participant may become entitled" under the provisions of "an employee

benefit plan, [ERISA], or the Welfare and Pension Plans Disclosure Act." 29 U.S.C. § 1140.

Section 510 of ERISA includes an antiretaliation and an antiinterference component. *Kirby*

*v. SBC Servs.*, 391 F. Supp. 2d 445, 455 (N.D. Tex. 2005).

Courts have "evaluate[d] retaliation claims under Section 510 of ERISA using the

same analytical framework applied to similar claims under Title VII of the Civil Rights Act

of 1964 . . . and other civil rights statutes." *Kreinik v. Showbran Photo, Inc.*, No. 02CV1172,

2003 WL 22339268, at *3 & n.3 (S.D.N.Y. Oct. 14, 2003). Under this framework, a plaintiff

asserting retaliation must show that: "(1) [he] was engaged in activity that ERISA protects;

(2) [he] suffered an adverse employment action; and (3) a causal link exists between [his]

protected activity and the employer's adverse action." *Hamilton v. Starcom Mediavest*

*Group, Inc.*, 522 F.3d 623, 628 (6th Cir. 2008); *accord Curby v. Solutia, Inc.*, 351 F.3d 868,

871 (8th Cir. 2003).

The elements of a *prima facie* showing of interference are a "(1) prohibited (adverse)

employer action (2) taken for the purpose of interfering with the attainment of (3) any right

to which the employee is entitled" or may become entitled. *Bodine v. Employers Cas. Co.*,

352 F.3d 245, 250 & n.3 (5th Cir. 2003). The plaintiff must show "some unscrupulous

conduct or intentional act" on the part of the employer. *Id.* at 250. Section 510 "is designed

to prevent 'employers from discharging or harassing their employees'" to avoid paying

benefits under an ERISA plan.  *Id.*  (quoting *Van Zant v. Todd Shipyards Corp.*, 847 F. Supp 69, 72 (S.D. Tex. 1994)).  Courts have held that section 510 does not prohibit "all employer actions undertaken with an eye toward thwarting the attainment of benefits; only changes in one's *employment status* cannot stem from benefit-based motivations."  *Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 545 (7th Cir. 1994); *accord Deeming v. Am. Standard, Inc.*, 905 F.2d 1124, 1127 (7th Cir. 1990) ("[A] fundamental prerequisite to a § 510 action is an allegation that the employer-employee relationship, and not merely the pension plan, was changed in some discriminatory or wrongful way.").

Carmouche does not argue that his discharge was in retaliation for, or to interfere with, his receipt of extended short-term disability benefits.  Carmouche instead argues that by actively communicating with UNUM about Carmouche's medical history, work history, and disability claim, Stephen Higgins of MEMC retaliated against Carmouche for seeking extended disability benefits and interfered with his ability to receive those benefits.  (Docket Entry No. 15 at 14–16).  Carmouche argues that Higgins's communications with UNUM were intended to prevent his attainment of extended short-term disability benefits and to retaliate for his efforts to receive them.

The record shows that on August 11, 2005, Higgins emailed UNUM to inquire "about the option of a third party evaluation to determine whether these restrictions and this prognosis are valid."  (Docket Entry No. 15, Ex. B at 4).  Higgins also had "a number of conversations" with UNUM about Carmouche's claim.  (Docket Entry No. 15, Ex. F. at 3).

26

UNUM nonetheless awarded Carmouche short-term disability benefits through July 2005. (Docket Entry No. 12, Ex. B at 16).  The evidence shows that UNUM declined to extend Carmouche's short-term disability benefits after reviewing his medical records and doctors' submissions.  (Docket Entry No. 12, Ex. B at 20–23).  UNUM upheld its decision to deny benefits based on a medical review of Carmouche's clinical records, (*id.*, Ex. B at 25–27), and Carmouche's failure to provide sufficient medical information in support of his claim, (*id.*, Ex. B  at 28–29).

Higgins submitted a description of the inside operator position after UNUM asked him to do so.  (Docket Entry No. 15, Ex. B at 7).  Higgins did not inform UNUM that Carmouche would be required to requalify and retrain for the more physically rigorous outside operator position.  However, Higgins provided the information to UNUM in July 2005.  Carmouche did not return to work on a light-duty basis until January 2006.  Higgins and MEMC have provided summary judgment evidence that the required requalification and retraining did not apply until Carmouche had been absent for this extended period.  The record does not raise a fact issue as to whether MEMC interfered with Carmouche's attainment of extended short-term disability benefits.

Nor does the record raise a fact issue as to whether MEMC retaliated against Carmouche for applying for short-term disability benefits through Higgins's communications with UNUM.  Carmouche does not allege or argue that he was fired in retaliation for applying for benefits.  Instead, Carmouche asserts retaliation in the form of Higgins's efforts

to influence UNUM to deny Carmouche's claim for extended short-term disability benefits. Section 510 protects an employee against changes to his employment status to thwart the attainment of benefits.  *See, e.g., Teumer*, 34 F.3d at 545.  MEMC is entitled to summary judgment on Carmouche's ERISA claims.

**V.   Worker's Compensation Retaliation**

Carmouche asks this court to allow him to withdraw his state worker's compensation claim and allow him to refile in state court. (Docket Entry No. 15 at 16).  Carmouche asserts that federal courts may lack subject-matter jurisdiction over such a claim because 28 U.S.C. § 1445(c) prohibits the removal of such claims to federal court.  (*Id.* at 16–17).  MEMC argues that 28 U.S.C. § 1445(c) does not divest this court of jurisdiction over Carmouche's claim.  (Docket Entry No. 18 at 20).  MEMC further argues that Carmouche's retaliation claim fails because there is no causal link between his worker's compensation claim and his discharge.  (Docket Entry No. 12 at 34–35).

"A civil action in any State court arising under the workmen's compensation laws of such State may not be removed to any district court of the United States."  28 U.S.C. § 1445(c).  "28 U.S.C. § 1445(c) proscribes only the *removal* of claims arising under state workers' compensation statutes. The statute does not prohibit plaintiffs from filing such actions directly in federal court." *Vasquez v. N. County Transit Dist.*, 292 F.3d 1049, 1061 (9th Cir. 2002); *accord Horton v. Liberty Mut. Ins. Co.*, 367 U.S. 348, 352 (1961) ("Congress used language specifically barring removal of such cases from state to federal courts and at

the same time left unchanged the old language which just as specifically permits civil suits to be filed in federal courts").

Section 451.001 of the Texas Labor Code prohibits an employer from discharging or discriminating against an employee because the employee has filed a worker's compensation claim.  TEX. LAB. CODE ANN. § 451.001.  "To recover under this section, an employee must show that the discharge would not have occurred when it did but for the employee's assertion of a compensation claim." *Burch v. City of Nacogdoches*, 174 F.3d 615, 623 (5th Cir. 1999); *see Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450 (Tex. 1996).

"The employee has the initial burden of demonstrating a causal link between the discharge and the filing of a workers' compensation claim." *Cox v. NextiraOne*, 169 S.W.3d 778, 781 (Tex. App. -Dallas 2005, no pet.); *accord Courtney v. Nibco*, 152 S.W.3d 640, 643 (Tex. App. -Tyler 2004, no pet.).  The Fifth Circuit has held that a lapse of fifteen to sixteen months negates the causal connection between an employee's discharge and the filing of a claim.  *Burch*, 174 F.3d at 623 (granting summary judgment for employer where twenty months passed between plaintiff's claim and discharge); *Burfield v. Brown, Moore & Flint, Inc.*, 51 F.3d 583, 590 (5th Cir. 1995) (holding that a "long time period" of fifteen or sixteen months "between the workers' compensation claim and the discharge militates against a finding of retaliation).

Section 1445(c) does not prohibit Carmouche from filing his state worker's compensation claim in federal court.  *See Horton*, 367 U.S. at 352; *Vasquez*, 292 F.3d at

29

1061.  This court has jurisdiction to review Carmouche's claim.  Carmouche's request for withdrawal is denied.

Carmouche filed for and received worker's compensation benefits after suffering a workplace injury in March 2001.   (Docket Entry No. 1 at 4).  The record is unclear as to whether he filed for and received worker's compensation benefits when he went on leave in April 2005 and, if so, for how long.  Carmouche was discharged from MEMC on January 27, 2006.  (Docket Entry No. 12, Ex. B at 31).  Because nearly five years passed between Carmouche's initial worker's compensation claim and discharge, and because there is no evidence as to whether and for how long he received such benefits in 2005, he cannot raise a fact issue as to the causal connection necessary under Texas Labor Code § 451.001.  *See Burch*, 174 F.3d at 623; *Burfield*, 51 F.3d at 590.  Summary judgment on Carmouche's worker's compensation retaliation claim is granted.

## IV.   Conclusion

This court grants MEMC's motion for summary judgment on Carmouche's claims for disability discrimination, ERISA retaliation and interference, and worker's compensation retaliation.   Final judgment is entered by separate order.

SIGNED on July 21, 2008, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge